Filed 8/16/21  P. v. Barberena CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>DENNIS ANTONIO BARBERENA,<br><br>　　　　Defendant and Appellant. | B305997<br><br>(Los Angeles County<br>Super. Ct. No. BA465947) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Affirmed.

J. Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Zee Rodriguez and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Dennis Barberena was convicted of committing 14 acts of sexual abuse against his daughter, N., and stepdaughter, M.  In addition to the testimony of N., M., and other witnesses, the court admitted into evidence incriminating statements appellant made during an interview conducted at a police station.  Appellant contends that his statements should have been excluded because the interview was a custodial interrogation, but he was not advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). He further contends that his sentence, 12 years plus 215 years to life, is unconstitutionally excessive. We affirm.

## PROCEDURAL HISTORY

Appellant was charged by amended information with five counts of sexual intercourse or sodomy with N., who was 10 years of age or younger at the time of the offenses (Pen. Code, § 288.7, subd. (a), counts 1, 4, 9, 10, 11)[1]; six counts of oral copulation or sexual penetration of N., who was 10 years of age or younger at the time of the offenses (§ 288.7, subd. (b), counts 2, 3, 5, 6, 7, 8); and three counts of willfully committing a lewd or lascivious act against M., who was under the age of 14 years at the time of the offenses (§ 288, subd. (a), counts 12, 13, 14).  Appellant pled not guilty and proceeded to jury trial.

During jury selection, appellant moved to exclude statements he made to police during the interrogation.  The court denied the motion, and a video recording of the entire interrogation was played for the jury and admitted into evidence along with the testimony of N., M., their mother, N.'s school

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

counselor, and the officer who interrogated appellant. The jury found appellant guilty of all charges.

The court sentenced appellant to the mandatory term of 25 years to life on each of the five intercourse or sodomy counts involving N. (§ 288.7 subd. (a), counts 1, 4, 9, 10, and 11) and ordered the terms to run consecutively. The court further sentenced appellant to the mandatory term of 15 years to life on each of the oral copulation or sexual penetration counts involving N. (§ 288.7, subd. (b), counts 2, 3, 5, 6, 7, and 8), and ordered those terms to run consecutively to one another as well as to the other indeterminate terms; appellant's aggregate indeterminate sentence totaled 215 years to life. The court sentenced appellant to a total of 12 years on the three counts of lewd and lascivious acts against M. (§ 288, subd. (a)), which it ordered to run consecutively to the indeterminate sentence.

Appellant timely appealed.

## FACTUAL BACKGROUND

In light of the issues presented on appeal and our resolution thereof, a detailed recitation of the facts is not necessary. We accordingly summarize only the most salient points.

### I. Witness Testimony

N. was 16 years old at the time of trial. She testified that appellant, her father, began "touching" her when she was eight years old. The touching, which happened "many times," escalated from touching her breasts and genital area with his hands over her clothes to undressing N. and inserting his hands, tongue, and penis into her vagina. N. estimated the incidents occurred about three time per week, while appellant was home alone with her after school. Appellant held her down with his

3

body weight and "made a moaning sound" during the incidents; N. found the abuse physically painful and said it made her feel "disgusting." Appellant told N. not to tell anyone about the incidents.

The family moved to a different house when N. was nine, where the abuse continued while she was nine and 10. On multiple occasions, appellant removed N.'s pants and underwear and touched and penetrated her "private area" with his hands, mouth, and his own "private area." When N. was 10, appellant began using his "front private area" to penetrate her "back private area."

N. did not tell anyone about the abuse for a long time because she was scared and embarrassed. When she was 15, however, she "felt like it was time for me to say something" and disclosed the abuse to a female teacher at her school. A counselor from N.'s school testified that N. came to her office "very upset and crying" in September 2017. In a "shaky" voice, N. discussed with the counselor "something that happened in her past having to do with molestation" by her father. The counselor, a mandated reporter, contacted authorities.

M. was 24 at the time of trial. She testified that appellant began dating her mother when she was six and moved in with the family when she was eight. At that point, he "started touching" her in her "private areas." M. testified that the first touching involved appellant's hand, above her clothes, but the second incident escalated to under her clothes and digital penetration of her vagina. The third time, appellant undressed her and threw her on the bed before touching her lips, breasts, and vagina with his mouth; on later occasions appellant penetrated her vagina with his penis and performed oral and anal sex. Appellant

4

withdrew his penis before ejaculating because "it was chances or not that I'd end up pregnant."

Although the abuse continued through her early teens, M. did not tell anyone because appellant told her no one would believe her. M. admitted that she was "known for lying to my mom a lot," mainly about "school stuff, or if I started a fight, or she was called that I was ditching." On cross-examination, defense counsel confronted M. with an excerpt from a forensic interview from 2018, in which she stated, "He said my mom wouldn't believe me. He goes, 'Nobody's going to believe you because all you do is lie.' And I do have a habit of lying. To this day, all I do is lie." M. initially said she did not remember making the statement, but admitted it was her voice on the audio recording played for the jury. On redirect, M. testified that she still lied to her mother when her mother was "very nosy" about "what I'm doing or who I'm with. I can be 24, but she still tries to run my life."

N. and M.'s mother, Rosa R., testified briefly about the various places the family lived and the years they had lived there; both N. and M. had testified they were abused in specific homes. On cross-examination, Rosa admitted that she had been convicted of misdemeanor child abuse of M. in 2011.

Los Angeles Police Department officer and detective trainee Jason Kim testified that he had been a police officer for 15 years and was currently assigned to the juvenile division's "abused child unit." Kim lived in Bolivia when he was younger and was fluent in Spanish. He first made contact with appellant, who speaks Spanish, on February 22, 2018, when he went to appellant's apartment to ask appellant to come to the police station for an interview. Because appellant was on his way to

5

work at the time, Kim set up an appointment for the interview on February 27, 2018. Kim told appellant that he was investigating a police report involving appellant.

Kim testified that appellant came to the station as scheduled on February 27, 2018. Kim did not drive him there. Kim interviewed appellant in Spanish at the station. A video recording of the entire interview was played for the jury; the jurors were provided with a certified English transcript that the court advised them was controlling. The contents of the interview are discussed below.

Kim testified that he used various department-approved "ruses" and "tactics" during the interview to "help[ ] the suspect be motivated to tell the truth." These included "telling him something that's not true," such as "M[.] had gone for various tests," to make him "think that I had something he didn't know I had previously." Kim also mentioned a lie detector test, to let appellant "know that we have those type of tools that we can later utilize." Kim explained that he used these sorts of ruses "[w]henever I feel that they're not forthcoming, that they're trying to cover up the truth, when they start denying." On cross-examination, he conceded that these ruses and tactics were lies. He also admitted that he "positioned" himself closer to the door during the interview, in such a way that he was not blocked by the table. Kim did not make any efforts to prevent appellant from making a false confession.

## II.     Interview

The entirety of appellant's interview with Kim was played for the jury and admitted into evidence. It is undisputed that the interview lasted approximately 2.5 hours and was not preceded by *Miranda* warnings.

6

At the outset of the interview, Kim thanked appellant for coming and told him, "you are not arrested, not at all. Obviously, if I had wanted to arrest you, I would have done it the other day, right?" Appellant responded, "Uh-huh, yes. No, I know." Kim then told him, "we can stop the interview for any reason whatsoever. You just tell me to. The door is only closed. It's not locked. Just for privacy." Appellant acknowledged, "No, yes, yes, yes." Kim then stated, "So if you need anything, please, tell me. Water, bathroom, whatever. Okay?" Appellant said that was okay.

To "get to know [appellant] a little more" before they "talk[ed] about the . . . case," Kim asked appellant questions about his background, family, and work history. Kim interacted with appellant as he answered the questions, and thanked appellant for "giving me the chance to get to know you," before shifting gears and telling him that the case was about N. and "a report that had said . . . that something happened with you and her. . . .that sexual relations happened."

Before asking appellant any questions about the report, Kim launched into a lengthy, one-sided exposition in which he stated that appellant was a good person who had "a good soul, good intentions" but experienced a "moment of error." Kim stated that good people like himself and appellant sometimes make mistakes, and when they do, "we are sorry, we ask forgiveness" and "look for help." Kim noted that appellant had acknowledged past mistakes but had changed for the better, and stated that he wanted to give appellant the opportunity to do the same now. He added, "you and I both know that . . . something like this happened . . . but . . . you are the only person who knows why"; "the only person who can know what you felt in your mind, in

7

your soul, in your body, only you can know that." Kim stated that N. "does not have any bad intentions towards you. Not at all. She was just sad . . . that she had to have that experience with you. But the thing is that she wants the opportunity to be able to fix that and . . . not only for her but for everyone involved we can offer free therapy." Kim also mentioned that the male body sometimes "will react automatically," and it's "not something that we can control." Throughout Kim's soliloquy, appellant said only "yes," "yeah," and "uh-huh."

Eventually, appellant said that sometimes N. "would jump on me," but he would tell N. that he was her father, and "hold her[] and everything, but nothing would happen." He added, "I don't know why that comes up." Kim then began another long soliloquy, during which he told appellant that he had faith in him and that he needed appellant to "take that first step" so he could "live free" and have a good relationship with N. At the conclusion of Kim's remarks, appellant stated, "I will do everything for my daughters, but I don't accept what she's saying . . . I mean, putting my penis there? I've never done that."

The interview continued in this vein for some time, with Kim making lengthy remarks and appellant denying he engaged in any improper conduct with N. Appellant also stated at least three times that he felt as though he could trust Kim. At one point, approximately halfway through the interview, appellant asked Kim if they could continue the interview the next day. Kim did not directly answer the question; he said, "this is really important," and "I don't want that—that you miss this opportunity."

Kim then turned the conversation to M.: "you know this, this also happened to M[.]. Okay?" Appellant immediately asked

Kim what he meant. Using the ruse he described in his testimony, Kim told appellant that M. had submitted to a forensic test and that the police had compared appellant's DNA with it. Kim said that police sometimes lied about such things, but assured appellant he was telling the truth. Kim also told appellant that he could be arrested for lying to a police officer.

Appellant asked Kim if he could talk to "my partner." Kim did not answer, but, after telling appellant he was "on your side," said he would "leave you here for a minute." It does not appear that Kim left, but appellant nevertheless became more talkative after that point. He continued to deny doing anything wrong.

Kim asked appellant to "take another small step and talk about M[.], about what happened. And let's take more small steps and that's it, we will get it done." Appellant then admitted that on one occasion, he came out of the bathroom wearing his boxer shorts, and M. "threw herself on top of me. Just like you said, suddenly and—and that was it." He continued, "She threw herself on me. . . . And from there . . . she left and came back again" after removing her clothing. In response to Kim's follow-up questions, appellant admitted that his penis became erect and claimed that M. put it inside her vagina. Appellant said he told M. to "[g]et out of here!" Kim replied, "after those few seconds you realized it was bad, that it was wrong," and appellant said, "Of course it was wrong." He then said something similar had happened again, except on that occasion M. was already nude when she jumped on him and put his penis in her vagina. Appellant said, "It was only two times," and that M. had been old enough to have a boyfriend2.

Kim told appellant that he had shown a lot of courage, and asked him to "be strong" one more time and talk about N.

Appellant repeatedly denied sexual contact with N., saying, "That didn't happen with her. Nothing like that happened and if you guys want you can also check her over. You'll see that she doesn't have anything . . . ." At that point, Kim said he needed a few minutes to look at his notes outside the room. Appellant asked if he could call his work, and Kim told him that was fine.

Before calling his work, appellant called an unidentified woman whom he called "honey." Appellant told her that N. had accused him of touching her but denied any wrongdoing. Appellant then briefly called his work before calling the woman again. She told him, "you have to tell them that you were in jail" at the time of the alleged abuse. Appellant said Kim already knew he had been in jail, and that he had said N. "would always throw herself on me" but that he "was never doing anything."

Kim returned to the room after appellant ended his third phone call. Appellant reiterated that nothing had happened with N. Kim responded, "she has no reason to lie." Kim further told appellant that he had already "confront[ed] the truth" with M., and needed to do so with N. Appellant admitted, "she threw herself on me, yes. She'd always jump on me like this. . . . [B]ut I wouldn't look at her like uh -- . . . 'Hey! Hold on!' I would say. . . . And she'd get off me but just uh—yes, one time she got on me like this 'Hey dad!' and she got on top of me." After further remarks and encouragement from Kim, appellant said that on one occasion, N. pulled down his boxer shorts because she "wanted to see" his penis. He said no, but she got on his body and put his penis into her vagina for one second, "just separating the lips." Appellant said it happened only once and denied that his penis was ever in N.'s mouth. He told Kim, "I don't want my daughter to be traumatized," and said he would like to tell both M. and N.

that he loved them and wanted them to forgive him.  Kim arrested appellant shortly thereafter.

## DISCUSSION

### I.     The interview was not custodial.

Appellant moved to exclude the statements he made during the police station interview.  Appellant argued that *Miranda* warnings were required because he was "in custody" during the interview.  Emphasizing the location (police station) and duration (2.5 hours) of the interview, and asserting that Kim used "persistent, confrontational, and accusatory" interrogation tactics, appellant argued that the circumstances of his interview were analogous to those in *People v. Saldana* (2018) 19 Cal.App.5th 432 (*Saldana*).  The prosecution opposed the motion, arguing that the interview was not custodial.

After viewing the videotape of the interview, the trial court orally denied appellant's motion.  In its remarks, the court noted several circumstances that suggested the interview was not custodial: appellant went to the station voluntarily; the door to the interview room was not locked; Kim advised appellant that he was not under arrest and was free to leave at any time; and Kim approached appellant in a nonconfrontational and "comforting manner" and "was not in the defendant's face."  The court also noted, however, "that there are issues, obviously":  the purpose of the interview was to elicit information about allegations against appellant; Kim sat between appellant and the door and moved closer to appellant during the interview; and Kim lied to appellant about the existence of forensic evidence.  The court concluded, however, that "on balance, I don't believe the detective did things that would have vitiated the earlier warnings that the defendant . . . was free to leave if he chose, and that he was not

11

under arrest. Everything about the tone of the interview was done with—in a very non-confrontational manner, unlike the case that you cited [*Saldana, supra*, 19 Cal.App.5th 432]. And I think that the facts there are quite different than what we have here."

Appellant contends the trial court's ruling was incorrect, and that the interview was custodial for purposes of *Miranda*. He argues that his case is factually analogous to two recent cases in which interviews were found to be custodial: *Saldana, supra*, 19 Cal.App.5th 432, and *People v. Torres* (2018) 25 Cal.App.5th 162 (*Torres*). We apply a mixed standard of review, in which we review for substantial evidence the trial court's factual findings regarding the circumstance of the interrogation but independently determine whether a reasonable person in appellant's position would have felt free to end the questioning and leave. Having done so, we disagree with appellant.[2] (*People v. Moore* (2011) 51 Cal.4th 386, 394 (*Moore*).)

To protect a suspect's Fifth Amendment right against self-incrimination, *Miranda* requires that, before a custodial interrogation, law enforcement must advise a suspect of the right to remain silent, that any statement made can be used against him or her in a court of law, that the suspect has the right to the presence of an attorney, and that if he or she cannot afford an attorney, one will be appointed. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085-1086.) "A statement obtained in violation of a suspect's *Miranda* rights may not be admitted to establish guilt in a criminal case." (*People v. Jackson* (2016) 1 Cal.5th 269, 339.)

---

[2] Because we conclude *Saldana* and *Torres* are not analogous, we do not reach the Attorney General's argument that both cases are "out of step with California Supreme Court and United States Supreme Court precedent."

*Miranda* applies only to "custodial interrogation." (*Miranda, supra,* 384 U.S. at p. 444; see also *Rhode Island v. Innis* (1980) 446 U.S. 291, 299-301 (*Innis*).)  There is no dispute that the interview here was an "interrogation," which is defined as express questioning or other words and actions on the part of law enforcement that law enforcement should know are reasonably likely to elicit an incriminating response from a suspect.  (*Innis, supra,* 446 U.S. at p. 301; see also *People v. Hensley* (2014) 59 Cal.4th 788, 810.)

"An interrogation is custodial, for purposes of requiring advisements under *Miranda,* when 'a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way.' [Citation.]  Custody consists of a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest.  [Citations.]  When there has been no formal arrest, the question is how a reasonable person in the defendant's position would have understood his [or her] situation.  [Citation.]."  (*People v. Moore, supra,* 51 Cal.4th at pp. 394-395,)  The inquiry is objective; it does not depend "on the subjective views harbored by either the interrogating officers or the person being questioned."  (*Stansbury v. California* (1994) 511 U.S. 318, 323.)

All the circumstances of the interrogation are relevant to determining whether it was custodial.  (*Moore, supra,* 51 Cal.4th at p. 395.)  "No one factor is dispositive.  Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest."  (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162.)  The most relevant

13

circumstances typically include: "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*Ibid.*)

The circumstances of the interview in this case did not amount to a restraint on appellant's freedom of movement tantamount to a formal arrest. Although Kim initiated contact with appellant, appellant voluntarily agreed to speak to him and went to the police station for the interview nearly a week later on his own volition. Kim informed appellant that the door to the interview room was not locked; that appellant could leave at any time, for any reason; and that appellant was not under arrest. Appellant verbally acknowledged this information at the outset of the interview, and later confirmed his understanding by asking Kim if he could make a phone call or perhaps continue the

14

interview another day.  Appellant was not physically restrained during the 2.5 hour interview and had—but did not take—the opportunity to leave when Kim stepped out of the room. Kim used the "ruse" of telling appellant that there was forensic evidence supporting the allegations against him, but he was not aggressive, confrontational, or otherwise accusatory with appellant.  To the contrary, he established such a rapport with appellant that appellant spontaneously expressed trust in Kim three separate times.  On balance, the totality of the circumstances here do not render the interview custodial.

Appellant contends *Saldana, supra*, 19 Cal.App.5th 432, compels the opposite conclusion.  In *Saldana*, defendant Saldana was a 58-year-old immigrant with a sixth-grade education. (*Saldana*, *supra*, 19 Cal.App.5th at p. 436.)  Three young girls from his neighborhood accused him of sexual abuse the day after they watched a telenovela episode involving child molestation. (*Id.* at pp. 436, 438-439.)  A detective investigating the allegations left a card at Saldana's home, and Saldana called and made arrangements for an interview at the police station.  (*Id.* at p. 441.)  The interview was conducted in Saldana's native Spanish.  (*Ibid.*)  The detective did not read Saldana his *Miranda* rights, but advised him that he was not under arrest and "can leave when you want" through the closed but unlocked door of the interview room.  (*Id.* at p. 442.)  The detective also told Saldana, "we're not going to arrest you right now." (*Ibid.*)  For about 38 minutes, the detective alternatingly minimized the severity of the alleged conduct and accused Saldana of engaging in inappropriate conduct with the girls.  (*Id.* at pp. 443-445, 447.) He also falsely told Saldana that the girls' clothing was being forensically tested.  (*Id.* at p. 446.)  Saldana unequivocally and

15

repeatedly denied the accusations.  (See *id.* at pp. 443-446.)  Eventually, though, Saldana admitted he had touched the girls.  (*Id.* at p. 447.)  In the remaining 15 minutes of the interview, Saldana provided further details about the conduct and acceded to the detective's request that he write the girls a "forgiveness letter."  (*Ibid.*)

The trial court denied Saldana's motion to exclude the statements he made during the interview.  (*Saldana, supra,* 19 Cal.App.5th at p. 441-442.)  The court of appeal reversed.  (*Id.* at pp. 438, 464.)  It concluded the interview was custodial after weighing the 13 factors listed above.  The court emphasized the "unrelenting number of accusatory questions" the detective posed, as well as the "persistent, confrontational, and accusatory" manner in which he posed them; Saldana's repeated denials; the detective's insistence on "the 'truth' until Saldana told him what he sought"; Saldana's trial testimony that he did not feel free to leave until he confessed; and Saldana's arrest at the conclusion of the interview.  (*Id.* at pp. 456-461.)

Appellant argues *Saldana* is "dramatically similar" to his case.  While there are some factual similarities, there are also distinctions that render the cases distinguishable.  Unlike the detective in *Saldana,* Kim did not pepper appellant with an "unrelenting number of accusatory questions," nor did he employ a confrontational or accusatory manner.  He engaged in friendly banter with appellant at the beginning of the interview and built rapport with him throughout by maintaining a nonconfrontational tone.  Rather than vehemently and repeatedly denying accusations, appellant frequently responded affirmatively while Kim was talking; he told Kim he trusted him.  Tellingly, appellant felt sufficiently comfortable to ask Kim if he

16

could make a phone call; Kim exited the room to allow him to do so, and did not return until appellant was done, even though appellant was not fully truthful about the nature of the phone call he wished to make. There is no indication that Kim prevented appellant from leaving during that time, or at any other point in the interview. Moreover, unlike the detective in *Saldana*, Kim did not qualify his statement that appellant was free to leave with an "ominous" "you will not be arrested 'right now.'" (*Saldana*, *supra*, 19 Cal.App.5th at p. 457.)

The other case on which appellant relies, *Torres*, *supra*, 25 Cal.App.5th 162, is even more distinguishable. There, two detectives interviewed Torres in their police cruiser about alleged child molestation. (*Torres*, *supra*, 25 Cal.App.4th at p. 176.) The doors to the cruiser were closed, and the engine was running to power the air conditioner. (*Ibid.*) The detectives told Torres he was not under arrest and was free to leave. (*Id.* at p. 167.) The detectives took a saliva sample from Torres, ostensibly to perform a DNA test in the trunk of the cruiser, and "dominated and controlled the course of the interrogation and used interrogation techniques to pressure Torres." (*Id.* at pp. 167, 176.) For instance, they asked him "if he wanted the judge to think he was an honest man who made a mistake, or 'an animal,'" told him the alleged victim had taken and passed a polygraph test, told him "to be brave and say that he made a mistake and would not do it again," and "drew a picture of a vagina and asked him to put an 'x' where he touched the girl." (*Id.* at p. 168-170.) They also "essentially [told] Torres they would not leave, and Torres could not return home, until Torres stopped lying and confessed to what the detectives could prove scientifically with the DNA test running in the trunk." (*Id.* at p. 179.)

17

By contrast, the interview here was conducted by a single, nonconfrontational officer in an interview room, not by two officers in their patrol car. Kim did minimize appellant's conduct, but did not insult him, lie to him about polygraph tests, or confront him with anatomical drawings. Most importantly, Kim at no time told or even insinuated that appellant was unable to leave unless he told Kim what Kim wanted to hear.

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." (*Oregon v. Mathiason* (1977) 429 U.S. 492, 495.) Appellant's freedom was not so restrained that the interview was tantamount to an arrest. Accordingly, the interview was not custodial, and *Miranda* warnings were not required.

## II. Appellant's sentence is not unconstitutionally excessive.

The trial court sentenced appellant to five consecutive terms of 25 years to life, six consecutive terms of 15 years to life, and a 12-year determinate sentence, all to run consecutively. Appellant contends the resultant term of 227 years to life violates both the federal constitutional prohibition on "cruel and unusual" punishment (U.S. Const., 8th Amend.) and the state constitutional prohibition on "cruel or unusual" punishment (Cal. Const., art. I, § 17.) He argues that "in light of Senate Bill 620,

18

which allows murderers to go free after 25 years, the One Strike law, which permits the imposition of consecutive 25 to life terms for each and every offense, is unconstitutional on its face because of the life sentence mandate."  He further asserts that our Supreme Court has recognized that "punishment for crimes for which the Legislature has mandated a life sentence should be modified where the particular defendant is 'less blameworthy,'" and he is "less blameworthy" "[b]ased on his lack of criminal history."  We reject these contentions.

"Under the Eighth Amendment of the United States Constitution, 'the courts examine whether a punishment is grossly disproportionate to the crime.'  [Citation.]  'Under the California Constitution, a sentence is cruel or unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity.'  [Citation.]"  (*People v. Johnson* (2013) 221 Cal.App.4th 623, 636.)  Whether a punishment is cruel and/or unusual is a question of law subject to independent review; the underlying disputed facts are viewed in the light most favorable to the judgment.  (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.)

The "One Strike" law, codified at section 667.61, "mandates indeterminate sentences of 15 or 25 years to life for specified sex offense that are committed under one or more 'aggravating circumstances,' such as when the perpetrator kidnaps the victim, commits the sex offense during a burglary, inflicts great bodily injury, uses a deadly weapon, sexually victimizes more than one person, ties or binds the victim, or administers a controlled substance to the victim."  (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 186.)  "The purpose of the One Strike law is 'to ensure serious and dangerous sex offenders would receive lengthy

prison sentences upon their first conviction,' 'where the nature or method of the sex offense "place[d] the victim in a position of *elevated vulnerability*." [Citation.]' [Citation.]" (*Ibid.*) The One Strike law applies only to specifically enumerated offenses. (See § 667.61, subd. (c).) It also requires the prosecution to plead and prove the aggravating circumstances. (§ 667.61, subd. (f).) Here, only three of appellant's 14 offenses, the lewd or lascivious acts prohibited by section 288, subdivision (a), are listed in section 667.61. (See § 667.61, subd. (c)(8).) His offenses against N., which violated section 288.7, are not among those listed in section 667.61. (See generally § 667.61, subd. (c).) Moreover, the prosecution neither pled nor proved any of the aggravating circumstances listed in section 667.61, subdivisions (d) or (e). Accordingly, appellant's contention that section 667.61 is facially unconstitutional is not relevant here.

Appellant's claim that "Senate Bill 620 . . . allows murderers to go free after 25 years" is similarly puzzling. Senate Bill 620 (Stats. 2017, ch. 682), which became effective January 1, 2018, gave trial courts discretion to strike firearm amendments imposed under sections 12022.5 and 12022.53 by amending sections 12022.5, subdivision (c) and 12022.53, subdivision (h). Neither section 12022.5 nor section 12022.53 applies exclusively to individuals convicted of murder; section 12022.5 applies to "any person who personally uses a firearm in the commission of a felony or attempted felony" (§ 12022.5, subd. (a)), while section 12022.53 applies to a list of 18 enumerated felonies, of which murder is but one. (§ 12022.53, subd. (a).) As amended by Senate Bill 620, neither statute by its terms "allows murderers to go free after 25 years." Rather, each permits the trial court to strike firearm enhancements.

Here, the court exercised its discretion under section 669 to impose consecutive sentences for appellant's section 288.7 and 288, subdivision (a) offenses, reasoning that if an indeterminate sentence were warranted for a single offense, each of the 14 separate offenses appellant committed against his daughter and stepdaughter over a period of years merited such punishment. This rationale indicates the court properly considered and applied the "[f]actors affecting the decision to impose consecutive rather than concurrent sentences" listed in California Rules of Court, rule 4.425.

Appellant argues that he was undeserving of consecutive sentences—and that such sentences were unconstitutionally excessive—because "[b]ased on his lack of criminal history, appellant is less blameworthy than other sex offenders," and the sentence "requires him to serve a term of years which cannot possibly be served in his lifetime and . . . makes no measurable contribution to acceptable goals of punishment." We are not persuaded. Each of appellant's indeterminate terms was mandated by the statute he violated. (See § 288.7.) "Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches." (*People v. Martinez, supra*, 76 Cal.App.4th at p. 494.) "Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*Ibid.*) Appellant has failed to demonstrate this is such a case.

The state constitutional analysis requires a three-pronged approach, under which we (1) evaluate "the nature of the offense and/or the offender, with particular regard to the degree of

danger both present to society," (2) "compare the challenged penalty with punishments prescribed for more serious crimes in [our] jurisdiction," and (3) "compar[e] the challenged penalty with the punishments prescribed for the same offense in other jurisdictions." (*In re Lynch* (1972) 8 Cal.3d 410, 425-427.) "The weight afforded to each prong may vary by case," and " '[d]isproportionality need not be established in all three areas.'" (*People v. Baker* (2018) 20 Cal.App.5th 711, 723 (*Baker*).) Appellant's assertions that he is less blameworthy than other offenders and that murderers are going free allude to but do not fully address any of the three prongs. More developed argument would not be persuasive in any event.

"Along a spectrum ranging from murder, mayhem and torture on one end to petty theft on the other, 'lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable.' [Citations.]" (*Id.* at pp. 724-725.) Indeed, the United States Supreme Court has recognized that the "sexual abuse of a child is a most serious crime and an act repugnant to the moral instincts of a decent people." (*Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 244.) Lewd conduct "may have lifelong consequences to the well-being of the child." (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806.) Both N. and M. were vulnerable due to their ages, and appellant abused a position of trust as their father and stepfather to commit the offenses. (*Baker*, *supra*, 20 Cal.App.5th at p. 725.) Appellant's lack of a serious criminal record does not outweigh these factors pertaining to the nature of the crimes. (*Ibid.*)

The second prong requires us to compare appellant's sentence to "punishments prescribed in the same jurisdiction for different offenses which, by the same test, must be deemed more

serious." (*In re Lynch*, *supra*, 8 Cal.3d at p. 426, italics omitted.) Appellant suggests—but does not support with relevant authority—that the punishment for the more serious offense of murder is less harsh than the punishment he faces. He does not mention the third analytical prong, which compares the punishment imposed with punishments imposed by other jurisdictions for the same offense. (*Id.* at pp. 427-429.) Because appellant makes no effort to undertake these analyses, we "take it 'as a concession that his sentence withstands [these] constitutional challenge[s]. . . .' [Citations.]" (*People v. Reyes* (2016) 246 Cal.App.4th 62, 89-90.)

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

WILLHITE, ACTING P.J.

CURREY, J.